UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMANDA BUSH, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | CIVIL ACTION NO. H-09-cv-1589 |
| | § | |
| UNUM LIFE INSURANCE COMPANY OF | § | |
| AMERICA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

The plaintiff, Amanda Bush ("Bush"), commenced the instant action against the defendants, Unum Life Insurance Company of America ("Unum") and the Reliant Energy Inc. Group Disability Plan (collectively, the "defendants") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (a)(1)(B),[1] alleging that Unum wrongfully denied her claim for long-term disability benefits due to her inability to work as a result of her disabling fibromyalgia and rheumatoid arthritis condition.   Bush seeks compensation for denied benefits, interest and attorneys' fees and costs.

Pending before the Court are Unum's motion for summary judgment (Docket Entry No. 16), Bush's response to Unum's motion for summary judgment and cross-motion for summary judgment (Docket Entry No. 18) and Unum's reply to Bush's response to its motion for summary judgment as well as its response to Bush's cross-motion for summary judgment (Docket Entry No. 19).   After having carefully considered the motion, cross-motion, responses, reply, the

---

[1] ERISA § 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

record and the applicable law, the Court is of the opinion that Unum's motion for summary judgment should be GRANTED; and Bush's cross-motion for summary judgment should be DENIED.

## II.   FACTUAL BACKGROUND

Bush began working as a customer care representative for Reliant Energy, Inc. ("Reliant") in Houston, Texas in 2004.   During this time, she participated in Reliant's group long-term disability plan for eligible employees, referred to as the Reliant Energy Inc. Group Disability Plan (the "Plan").   Reliant contracted with Unum to provide long-term disability coverage for its employees under the Plan, pursuant to policy No. 572944 001, effective January 1, 2003.   Pursuant to the specific terms of the Plan, Reliant is designated as the Plan Administrator and named fiduciary with the authority to delegate its duties.   (*See* Docket Entry No. 16, Ex. A at UACL00128).   The Plan also expressly gives Unum the discretionary authority to interpret its terms and decide questions of eligibility for coverage.   (*Id.* at UACL00133)

Assuming a participant and/or beneficiary is determined to be "disabled" within the meaning of the Plan, benefits are set to begin the day after the completion of the elimination period.   (*Id.* at UACL00101)   The elimination period is defined to include "[t]he earliest of 180 days or 6 months."   *Id.*   The maximum period of payment for a participant or beneficiary who is less than 63 years old at the time of disability is to "Social Security Normal Retirement Age or 42 months, if greater."   *Id.*   The term "disabled" is defined under the Plan as follows:

> You are disabled when Unum determines that:
>
> -   you are limited from performing all the material and substantial duties of your **regular occupation** due to your sickness or injury; and
>
> -   you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

> After 24 months of payments, you are disabled when Unum
> determines that due to the same sickness or injury, you are unable
> to perform the duties of any gainful occupation for which you are
> reasonably fitted by education, training, or experience.
>
> You must be under the regular care of a physician in order to be
> considered disabled.
>
> We may require you to be examined by a physician, other medical
> practitioner and/or vocational expert of our choice.  Unum will pay
> for this examination.  We can require an examination as often as it
> is reasonable to do so.  We may also require you to be interviewed
> by an authorized Unum Representative.

(*Id.* at UACL00113) (emphasis in original).

Additionally, the Plan provides for the payment of benefits in the event that a participant or beneficiary continues to work during his or her period of disability.  Specifically, it states "[w]e will send you the monthly payment if you are disabled and your monthly **disability earnings**, if any, are less than 20% of your indexed monthly earnings, due to the same sickness or injury."  (*Id.* at UACL00115)  The Plan further provides for the termination of benefit payments and a participant's claim on the earliest of the following occurrences:

- during the first 24 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- if you are working and your monthly disability earnings exceed 80% of your indexed monthly earnings, the date your earnings exceed 80%;
- the end of the maximum period of payment;
- the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
- the date you fail to submit proof of continuing disability;
- after 12 months of payments if you are considered to reside outside the United States or Canada.  You will be

> considered to reside outside these countries when you have
> been outside the United States or Canada for a total period
> of 6 months or more during any 12 consecutive months of
> benefits;
> - the date you die.

(*Id.* at UACL00119)  Finally, the Plan provides that a participant or beneficiary's coverage under

the policy and/or Plan ends on the earliest of the following events:

> - the date the policy or plan is cancelled;
> - the date you no longer are in an eligible group;
> - the date your eligible group is no longer covered;
> - the date you are eligible for coverage under a plan intended
>   to replace this coverage;
> - the last day of the period for which you made any required
>   contributions; or
> - the last day you are in active employment except as
>   provided under the covered layoff or leave of absence
>   provision.

> Unum will provide coverage for a payable claim which occurs
> while you are covered under the policy or plan.

(*Id.* at UACL00110 - 11)

On December 5, 2006, Unum received Bush's initial claim packet for disability benefits.

The claim form, executed by her on November 20, 2006, provided that her diagnosis of

fibromyalgia prevented her from working and performing her daily responsibilities.   She

reported that her last day of work was on August 2, 2006, and that she was currently treating

with Dr. S. Arif Ali, a rheumatologist.   An Attending Physician's Statement ("APS") from Dr.

Ali was also included in her claim's packet.   In his APS, Dr. Ali reported that Bush first sought

treatment with him relative to her fibromyalgia condition on November 15, 2006, at which time

she described her subjective symptoms as "stiffness, pain, fatigue, weakness and tenderness."

(Docket Entry No. 16, Ex. B)  He listed her current treatment program as "medication."  (*Id.*)  He

further reported that he did not advise her to cease work due to her condition and that she had

done so prior to being seen by him.  (*Id.*)  With regard to her physical capabilities, psychological features, restrictions and limitations, he listed "See FCE."[2]  (*Id.*)

A Functional Capacity Evaluation dated November 27, 2006, and completed by Therapist Cruz Elena Ibarguen of HWF Impact, upon referral by Dr. Ali, concluded that Bush "did not meet any work level" and that "[s]he [was] at less than a sedentary work level."  (Docket Entry No. 16, Ex. N at UACL00032 - 39).   It further concluded that Bush "DID NOT MEET the requirements for her current job or any job physical or functional demand due to her severe weakness in the bilateral and lower extremity, her whole spine, her decreased [lumbar] flexibility in her whole body, her great difficulty with breathing while performing any physical or functional tasks."  (*Id.*)  It is important to note, however, that at the time of the evaluation, Bush described her symptoms as "[t]hrobbing pain in the neck; [c]onstant throbbing pain in the lower back; [p]ain in both upper extremities; [p]ain in both lower extremities, mainly mid thigh; and [l]oss of breath when sitting, lying or standing for prolonged periods of time and with lifting more than 10."  (*Id.* at UACL00032)  She also rated her pain as a "10" on a scale of 0 to 10, with a 10 at worst and a 6 – 7 at best.  (*Id.*)

Upon receiving Bush's claim, Unum acknowledged receipt of it and began gathering medical records from all of her past treating physicians.   A chronological categorization of the information contained in the administrative record as of the date on which Unum confirmed its determination that Bush was no longer entitled to long-term disability payments pursuant to the terms of the Plan is detailed below:

**August 16, 2006**:  Medical records obtained from orthopedic surgeon Thomas K. Cartwright indicate that Bush's initial office visit with him transpired on August 16, 2006, at which time she presented with complaints of low back pain recently emanating on August 2, 2006.  (*Id.* at UACL00180 - 182.)  She noted that she has had back pain in the past, but reported no known injuries to her lower back.  (*Id.*)  She described her pain as sharp and noted that it increased with

---

[2] "FCE" is defined in the administrative record as Functional Capacity Evaluation.

prolonged sitting, standing and/or walking. (*Id.*) She also reported that her pain subsides when she is sitting in her recliner with her feet up. (*Id.*) Dr. Cartwright noted that a review of her lumbar MRI report, dated August 11, 2006, denoted mild degenerative changes with no herniation or areas of stenosis. (*Id.*) Consequently, he prescribed medications, physical therapy and provided her with a list of local physiatrists for continued nonsurgical treatment. (*Id.*) He further advised her to return to him on an "as needed" basis. *Id.*

**August 18, 2006**: Bush presented to Dr. Samuel Alianell, a physiatrist referred by Dr. Cartwright, with complaints of low back pain originating since the age of 14. (*Id.* at UACL00183 – 190) She described her pain level as an "8" on a scale of 0 to 10 with medication. (*Id.*) Upon examination, Dr. Alianell diagnosed her as exhibiting chronic mechanical low back pain and muscle spasm. (*Id.*) He advised her that her treatment options included activity modification and physical therapy. (*Id.*) Bush agreed to commit to both. (*Id.*) Thereafter, Dr. Alianell prescribed physical therapy, three times a week for four weeks and instructed her to schedule a follow-up appointment with him in one month. (*Id.*)

**September 11, 2006**: Bush returned to Dr. Alianell for her follow-up visit with similar complaints of low back pain. (*Id.* at UACL00191 – 202) She reported that she was doing worse since her last visit and described her pain level as being at a "10/10 without meds." (*Id.*) She also reported that she had stopped attending physical therapy because she could not afford it. (*Id.*) His diagnosis remained the same. (*Id.*) He recommended home modalities and a home exercise program if she is unable to attend physical therapy. (*Id.*) He further requested that she obtain a MRI brain report and follow-up with a neurologist. (*Id.*)

**October 3, 2006**: Bush reported to another orthopedic, Dr. Larry Likeover, with complaints of non-radiating, central low back pain in her lumbar region. (*Id.* at UACL00255). During her office visit with him, she stated that she does sometimes feel that the area near her lumbar spine feels like it has decreased sensation, but no pain or numbness specifically radiating down into her legs and no focal neurologic complaints. (*Id.*) She also stated that she had been out of work for several months due to her back pain because the "light duty restrictions [require her] to sit but [sic] in a chair all day [and] she is not allowed to stand up at her cubicle." (*Id.*) Upon physical examination, Dr. Likeover noted no tenderness to palpation of the lumbar spine or paraspinous muscles. (*Id.*) When asked to perform forward flexion and extension, Bush refused, stating that she was unable to do so because the pain was just too bad. (*Id.*) Dr. Likeover further noted that she only forward flexed about 20 degrees and that she would not even attempt to perform extension. (*Id.*) She also stated that any rotation "hurts her back too much." (*Id.*) Dr. Likeover noted that her bone scan was normal and that her MRI showed some diffuse disk bulging throughout her lumbar spine which he noted as minimal. (*Id.*) He reported no evidence of any focal herniated disk and some evidence of disk desiccation consistent with diffuse degenerative disk disease. (*Id.*) His assessment was noted as "[b]ack pain of unknown etiology, possibly some facet joint pain. (*Id.*) As a result, he referred her to Dr. Rick Shepherd for possible DRX treatment for her degenerative disk disease. (*Id.*) Additionally, he recommended that she see Dr. Charnov for evaluation for any possible need for facet joint injections. (*Id.*) He further recommended that she remain on light duty work and follow-up with him in 3 to 4 weeks. (*Id.*)

**October 24, 2006**:  Bush returned to Dr. Likeover for a follow-up visit, requesting to be off work, citing that she had severe back pain and requesting other treatment.  (*Id.* at UACL000258.)  She stated that the DRX treatment from Dr. Shepherd did not help her and that Dr. Charnov's appointment schedule was booked through the next three weeks.  (*Id.*)  Dr. Likeover noted his impression of her as follows:

> Functional female.  Secondary gain appears present.  I advised her I will not give her a note to stay off work indefinitely.  She does not appear to have any sign of orthopedic problem of significance.

(*Id.*)

**November 15, 2006**:  Bush presented to Dr. Ali for follow-up, complaining of a number of symptoms, including excessive fatigue, muscle weakness, insomnia, tender points in the muscles, chronic low back pain and sensitivity to the sun.  (*Id.* at UACL000478)  She also complained of joint pain and joint stiffness involving the knees, ankles, shoulder and hip joints over the last three months as well as diffuse muscle aches involving both upper and lower extremities.  (*Id.*)  Upon physical examination, Dr. Ali noted that there were tender trigger points present medially and laterally in both elbows, both knees, upper back and lower back.  (*Id.*)  His assessment was fibromyalgia.  (*Id.*)  He ruled out inflammatory arthritis.  (*Id.*)  Consequently, he requested that certain blood tests be performed and advised Bush to do range of motion exercises of both upper and lower extremities.  (*Id.* at UACL00479)  She was further advised to take Glucosamine (1500 mg) once a day to improve the flexibility of her joints and to continue with Levoxyl.  (*Id.*)  He stated that he would reassess her clinically after reviewing her blood tests, rheumatoid factor, sedimentation rate and CCP antibodies.  (*Id.*)

**December 5, 2006**:   Reliant filed an Employment Statement dated December 5, 2006, confirming that Bush last worked as its full-time employee on August 1, 2006, as a customer care representative, with an annual salary of $32,510.  *Id.* at UACL00030-31.  It also attached a copy of her job description.

**January 16, 2007**:  Unum's in-house physician, Dr. Stephen Jacobson, one of its board-certified internists, reviewed Bush's claim and the associated medical records gathered from her past treating physicians.  (*Id.* at UACL00270)  Upon his review, he noted that the FCE completed by Therapist Ibarguen of HWF Impact on November 27, 2006, concluded that Bush was not able to perform her job at the sedentary level and that  the APS prepared by Dr. Ali referred to those conclusions when reporting on the extent of Bush's restrictions and limitations.  (*Id.*)  Dr. Jacobson reasoned that "the limited medical data suggests that . . . Bush would be limited per the FCE."  (*Id.*)  He further noted that Dr. Likeover's medical records detailed some inconsistencies in Bush's reported pain and function based on observations made by him in his office.  (*Id.*)  Thus, Dr. Jacobson concluded that a re-evaluation in several months would be reasonable given that it is likely that Bush would improve over time.  (*Id.*)  After noting that Dr. Ali, Bush's rheumatologist, requested that she follow-up with him on an as needed basis, Dr. Jacobson recommended that Unum obtain the records relative to Bush's office visits with Dr. Ali over the next several months to obtain further information in assessing her function.  (*Id.*)

**January 30, 2007**:  Unum advised Bush by letter dated January 30, 2007, that her long-term disability claims for benefits had been approved, from January 29, 2007, 180 days after her reported onset of disability.  (*Id.* at UACL00331)  It further advised her that "[i]n order to qualify for ongoing benefits, [she] must continue to meet the definition of disability" and that "periodically, [it would] request medical evidence and vocational information to support the continuation of [her] disability benefits."  (*Id.* at UACL00332)

**June 25, 2007**:   Bush submitted her supplemental claim statement, entitled "Claimant's Supplemental Statement" on June 25, 2007, advising that she was "unable to sit, stand for long and short periods of time" and that she experienced "difficulties writing, typing [and] talking."  (*Id.* at UACL00455)  She also reported that she had last seen Dr. Ali on April 7, 2007, and that she was continuing the treatment and medications recommended by him.  (*Id.*)  She further reported that she made an emergency room visit to Willowbrook Methodist Hospital on June 1, 2007, and that her current condition prevented her from caring for herself.  (*Id.*)  Finally, she noted that she applied for Social Security Disability Income ("SSDI") in April of 2007.  (*Id.* at UACL00455 – 56)

**July 30, 2007**:  Dr. Ali, Bush's treating rheumatologist, submitted a supplemental APS, noting, under the section labeled "Subjective Symptoms" that Bush complained of diffuse muscle aches involving both her upper and lower extremities, difficulty sleeping---insomnia, depression, hurts, stiffness and pain in joint muscles all over.  (*Id.* at UACL00448 - 53.)  He noted that she had ceased working because of the condition.  (*Id.*)  Nevertheless, he reported that he had not advised her to cease work and that she had ceased working prior to being seen by him.  (*Id.* at UACL00448)  His diagnosis remained fibromyalgia and depression.  (*Id.*)  With regard to her restrictions and/or limitations on her physical capabilities, he noted "SEE FBT report."  (*Id.*)  Attached to his supplemental APS was a copy of a report from Select Physical Therapy dated July 27, 2007, and prepared by Physical Therapist ("PT") Eric Wilson.  (*Id.* at UACL00440 – 53)  Mr. Wilson's assessment of Bush upon examination was reported as follows:

> Pt. attended a baseline test today.  Based on what she was able to perform, she would fall into the sedentary category.  She was unable to perform some of the tests today due to patient limitations or stoppage by examiner due to poor body mechanics and risk of injury.

(*Id.* at UACL00451).

**October 22, 2007**:  By letter dated October 22, 2007, Unum contacted Dr. Ali to obtain clarification concerning Bush's work capacity level in light of his reference to the FCE dated July 27, 2007, with regard to her current restrictions and limitations.  (*Id.* at UACL00502 – 03)  Specifically, it requested that Dr. Ali review the definition of "Sedentary Work" as established by the Dictionary of Occupational Titles and confirm whether or not he agreed that Bush is able to perform work at a sedentary capacity level and whether she is able to perform such work on a full-time basis.  (*Id.*)  It further requested that Dr. Ali explain in detail Bush's current restrictions and limitations and supply medical documentation supporting the same, in the event he determines that she does not qualify for work at the sedentary capacity level.  (*Id.* at UACL00503)

**November 1, 2007**:  Christina, the individual responsible for handling the disability paperwork for Dr. Ali's office, contacted Unum by telephone concerning Bush.  (*Id.* at UACL00507)  She recalled that Bush came into Dr. Ali's office back in July with an APS form that she wanted him to fill out prior to her having completed a FCE exam.  (*Id.*)  She confirmed that Dr. Ali never took Bush out of work and that he was not advising her to remain out of work.  (*Id.*)  She further advised that Bush ceased working on her own and that Dr. Ali supports the findings in the most recent FCE.  (*Id.*)  Thereafter, she asked whether the paperwork previously sent to Dr. Ali's office by Unum still needed to be completed.  (*Id.*)  Unum advised her to simply confirm the information discussed on the form.

**November 5, 2007**:  A vocational assessment relative to Bush's occupation was conducted by Dorothy C. Edwards, Unum's senior vocational rehabilitation consultant on November 5, 2007. (*Id.* at UACL00509 – 512)  Edwards confirmed that Bush's occupation as a Customer Care First Call Resolution Representative required exertion at the sedentary physical demand level.  (*Id.* at UACL00509)  She further stated that "[i]t is [her] professional opinion . . ., with a reasonable degree of vocational certainty, that if [Bush] has sedentary work capacity, with no additional specific postural restrictions and limitations, she would not be precluded from the performance of the material and substantial duties of her own occupation."  (*Id.* at UACL00512)

**November 12, 2007**:  Unum notified Bush by letter, dated November 12, 2007, that based on the information contained in its file relative to her claim, her long-term disability benefits were being terminated because she did not satisfy the definition of "disability" within the meaning of the Plan and her purported disability was not supported by medical documentation.  (*Id.* at UACL00518 – 22; see also Ex. H)  First, it noted that the FCE dated July 27, 2007, concluded that she was capable of performing a sedentary occupation.  (*Id.*)  Second, it informed her that Dr. Ali, her only treating physician, referred to the findings in the FCE dated July 27, 2007, when asked about the restrictions and limitations on her physical capacity.  (*Id.*)  Third, it advised her that Dr. Ali confirmed that he did not take her out of work, that she had ceased working prior to her first office visit with him and that he was not currently keeping her out of work.  (*Id.*)  It further advised her that Dr. Ali confirmed that he agreed with the results of the July 27th FCE.  (*Id.*)  Fourth, it stated that a vocational assessment of her regular occupation concluded that she is not precluded from the material and substantial duties of her occupation as it is performed in the national economy.  (*Id.*)  Fifth, it advised her that Reliant had informed it that she was discharged as of December 5, 2006.  (*Id.*)  Finally, Unum informed Bush of her right to appeal its decision within 180 days of the date of the letter and detailed the appropriate procedures for initiating an appeal.  (*Id.*)

**November 30, 2007**:  By faxed correspondence dated November 30, 2007, Bush timely requested an administrative appeal of Unum's benefit determination, conveying her subjective complaints and frustrations in light of her condition and enclosing a new FCE report from Workstrategies prepared by Physicial Therapist Karen Ray.  (Docket Entry No. 16, Ex. N at UACL00553 – 560)  In the FCE report, dated November 20, 2007, Physical Therapist Ray noted Bush's physical demand level as being "less than sedentary" and further concluded as follows:

> The results of the evaluation indicate that Amanda Bush demonstrated limited abilities in [the] sedentary category of work (according to the

D.O.T.) with a ten-pound knuckle to shoulder lift on an occasional basis. She stopped the lift due to subjective reports of increased pain and did demonstrate an increase in heart rate that correlates with reports of increased pain.  She declined to perform other lifts stating that she did not think she could perform the lifts and might drop the box.  Mrs. Bush demonstrated the ability to sit on a constant basis, the ability to stand and perform desk level reaching on a frequent basis, and the ability to walk, kneel, carry, push/pull, stoop and crouch on an occasional basis.  She demonstrated frequent positional changes during testing.  . . . She was consistent in 11 of 20 tests.

(*Id.*)   Notably, however, he also reported that Bush gave less than maximum effort and/or voluntarily stopped one or more tests prior to completion: *e.g.*, "Ms. Bush stopped the test after 45 minutes due to subjective reports of increased pain."  (*Id.* at UACL00566); "Amanda Bush therefore demonstrated a positive REG which may be an indicator of submaximal effort."  (*Id.* at UACL00571); "Bush demonstrated a safe weight lifting ability of 0 lbs.  The reason for the conclusion of the dynamic lifting protocol was the fact that Bush voluntarily stopped the test." (*Id.* at UACL00573); "Bush demonstrated a safe weight lifting ability of 10 lbs.  The reason for the conclusion of the dynamic lifting protocol was the fact that Bush stopped the test due to psychophysical factors."  (*Id.* at UACL00574)

**January 14, 2008**:  Unum referred Bush's claim file as well as the additional information she submitted on appeal to one of its board-certified internal medical physicians, Dr. Beth Schnars. (*Id.* at UACL00639 – 643; *see also* Ex. I.)  Dr. Schnars reviewed all of Bush's medical records dating back to August of 2006, and opined, in part, as follows:

- The infrequency of office visits and lack of intensity of treatment are not consistent with a severity of illness that would support lack of sedentary work capacity.
- Fibromyalgia is not a disease of muscle pathology and does not cause weakness.  Fibromyalgia is not a progressive process.  However, patients with fibromyalgia will often limit their activity level to the degree where they become deconditioned.  If the deconditioning continues, this might create the impression of progression of the fibromyalgia for the claimant. The actual process of fibromyalgia is not considered to be impairing, however the perception that one is impaired by this label may self reduce one's perceived ability to function.
- There is no underlying physiologic explanation contained in the medical records as to preclude work at the sedentary or even light work capacity level.  It would be expected with prolonged inactivity that Ms. Bush would be deconditioned and it would be reasonable to support a period of work hardening. . . . There is no underlying pathophysiologic reason as to why Ms. Bush is incapable of performing activities such as bathing, dressing, and getting out of bed [as] she reports.  She had noted in a 7/07 evaluation that she was unable to cook, but in a later correspondence [she] noted that she had to do all of the cooking in the home and [would] clean when she

sometimes [couldn't] sleep.  Other than self report[s] of the claimant['s] perceived ability the medical records as noted are inconsistent with total impairment.  Ms. Bush's altered perception of her ability is not based on pathophysiologic indications and is not an adequate marker to base sustained functional capacity.  There are medical records which are alluded to such as the six ER evaluations for pain and one for an anxiety attack, and [an office visit note] from Dr. Ali past 4/07 which would be helpful to further assess functionality.  It should be also noted that Dr. Ali had not supported total loss of work capacity.

- It is my opinion with a reasonable degree of medical certainty that the following accommodations and long term restrictions are reasonable and supported in the medical records provided and would permit a return to work as of 11/20/07:

  **Accomodations**:

  1. Work reconditioning to consist of fours hours a day, three days a week to progress to eight hours a day five days a week over a 4 week period.
  2. Use of a lumbar support device, as needed for prolonged sitting.

  . . .

(*Id.*)

**January 23, 2008**:  Unum, thereafter, referred Bush's claim file, the supplemental information submitted by her on appeal and Dr. Schnars' report to G. Shannon O'Kelley, one of its senior vocational rehabilitation consultants, to obtain a new vocational analysis of Bush's occupation. (*See* Docket Entry No. 16, Ex. J; *see also* Ex. N at UACL00659 - 65).  In a vocational report dated January 24, 2008, O'Kelley concluded as follows:

> The overall physical requirements of [Bush's] occupation would be characterized as being sedentary and would not require one to exert more than 10 pounds occasionally.  The occupation would not require prolonged bending, stooping, or reaching below the waist.  The occupation would not require prolonged work above shoulder height.  The occupation is performed in a work environment that would allow one control over positioning such that changes in positions could occur as needed.  The occupation would not require more than occasional standing/walking/stair climbing.  The occupation would not require highly repetitive trunk motions. . . . The material duties of [Bush's] occupation could be performed with the restrictions and limitations presented.  The occupation would also be expected to exist and be available on a part-time basis such that one could begin part-time and progress to full time work.

(*Id.*)

**January 24, 2008**:  Given Dr. Schnars' reference to six emergency room evaluations and an office visit note from Dr. Ali post April of 2007, Unum wrote to Bush advising her that additional information needed to be obtained in order to complete its evaluation of her appeal and that it had requested updated medical information relative to her condition from Dr. Ali's office.  It further requested that she provide it with the contact information for the facilities where she received emergency room treatment.  (*Id.* at UACL00671.)  Unum, thereafter, obtained and reviewed Bush's emergency room records from Cypress Fairbanks Medical Center.

**January 24, 2008**:  On January 24, 2008, Unum received a faxed correspondence from Dr. Ali's office responding to its request for updated medical information and providing the following responses to its questionnaire concerning Bush's work capacity.

      1.      Do you agree with the 11/20/07 FCE findings?

            **Response**:      No – she has DX Fibromyalgia intermittently flare-ups only.

      2.      If not, is it still your opinion that she can perform sedentary work activities?

            **Response**:      Yes

(*Id.* at UACL00741; *see also* Ex. K).

**March 6, 2008**:  After obtaining the emergency room records from Cypress Fairbanks Medical Center as well as the updated medical records from Dr. Ali, Unum forwarded Bush's file back to Dr. Schnars for further medical and clinical review in order to determine whether these records supported her initial determination.  (Docket Entry No. 16, Ex. L; see also Ex. N. at UACL00800 – 01).  In an Addendum Medical Response dated March 6, 2008, Dr. Schnars concluded that, after having reviewed Bush's emergency room records as well as the updated medical reports from Dr. Ali, her opinions and conclusions expressed in her previous report dated January 14, 2008, remained unchanged.  (*Id.*)

**March 10, 2008**:  Unum notified Bush by letter, dated March 10, 2008, that after having completed its evaluation of her appeal, it determined that its initial decision to terminate her long-term disability benefits should be upheld.  (*Id.* at  UACL00807 – 11; *see also* Ex. M).  It further informed her that since its medical and clinical review supported her "return to work for fours hours a day, three days a week to progress to eight hours a day five days a week over a 4 week period," it would pay her an additional month of benefits to sustain her during her transition to full-time work.  *Id.*

**March 21, 2008**:  Bush contacted Unum by telephone on March 21, 2008, concerning its decision to uphold its initial benefits determination.  (*See* Docket Entry No. 16, Ex. N. at UACL00820 – 21).  According to the claim file notes, she expressed her frustration and the fact that she was very upset with Dr. Ali.  (*Id.*)  She stated that Dr. Ali would tell her one thing and tell Unum something entirely different.  (*Id.*)  She then inquired as to what she could do to appeal

the decision.  (*Id.*)  Unum informed her that its appeal had been completed, but also advised her that if she had additional information to submit, it would review it for further consideration of her claim.  (*Id.*)

**May 27, 2009**:   Bush initiated the instant action against Unum and the Plan seeking compensation for past and future benefits under the Plan as well as costs and attorney's fees.

## III.   CONTENTIONS OF THE PARTIES

### A.   Unum's Contentions

 Unum contends that it is entitled to summary judgment in this case because there is no evidence in the administrative record indicating that it abused its discretion in making the benefits determination at issue.  Unum also asserts that there is no evidence in the administrative record supporting Bush's contention that its conflict of interest influenced its decision to terminate her benefits or that the circumstances surrounding its decision in this instance suggests procedural unreasonableness.  Accordingly, Unum contends that its decision should be affirmed and that it is entitled to judgment as a matter of law on Bush's claim.

### B.   Bush's Contentions

Bush contends that Unum abused its discretion when it terminated her benefits because there was no rational connection between its conclusion that she was not disabled and the information on which it relied to support that conclusion.  She also contends that Unum relied heavily on Dr. Ali to support its denial decision, without ever confirming his actual opinions and/or conclusions relative to her condition.  She further asserts that Unum's decision to deny her continued disability benefits ignored available facts, was arbitrary, and denied her a full and fair review of her claim.  She argues that although Unum initially approved her claim, it selectively reviewed evidence to support its subsequent decision to deny her claim.  To this end, she avers that Unum simultaneously ignored new evidence provided by her that supported her

long-term disability claim.   Consequently, she argues that Unum's motion for summary

judgment should be denied and her cross-motion for summary judgment should be granted.

## IV.   APPLICABLE LEGAL STANDARDS

### A.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving

party bears the initial burden of "informing the Court of the basis of its motion" and identifying

those portions of the record "which it believes demonstrate the absence of a genuine issue of

material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party

meets its burden, the nonmoving party must then "go beyond the pleadings and by [its] own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (internal citation

omitted).

In adjudicating a motion for summary judgment, a court is required to view all facts in

the light most favorable to the nonmoving party and any inconsistencies are to be resolved in the

nonmoving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).  During this time, a court must also look to the substantive law underlying the lawsuit.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he substantive law will identify

which facts are material."  *Id.*  "A dispute regarding a material fact is 'genuine' if the evidence

would permit a reasonable jury to return a verdict in favor of the nonmoving party."  *Roberson v.*

*Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).  Thus, "[t]he appropriate inquiry [on

summary judgment] is 'whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251 - 52).

### B.   Standard of Review Under ERISA

The United States Supreme Court has generally held that the denial of a right to benefits under an ERISA plan is reviewed under a *de novo* standard.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989); *see also Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 629 (5th Cir. 2004).  However, where the benefit plan expressly confers the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" on the plan administrator or fiduciary, the applicable standard of review is abuse of discretion.   *Firestone*, 489 U.S. at 115, 109 S. Ct. 948; *Baker*, 364 F.3d at 629; *see also Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp.2d 724, 731 (S.D. Tex. 2005) (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems.*, *Inc*., 168 F.3d 211, 213 (5th Cir. 1999)).  Here, the Plan vests Unum with discretionary authority to determine a participant's eligibility for benefits and thus, the standard of review applicable is the abuse of discretion standard.  The relevant Plan provision provides the following review authority:

> In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute a final review of your claim by the Plan.  Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

 (Docket Entry No. 16, Ex. A at UACL00133.)

A plan administrator or fiduciary's factual determinations under an ERISA plan are also reviewed pursuant to an abuse of discretion standard.  *Vercher v. Alexander & Alexander, Inc*., 379 F.3d 222, 226 (5th Cir. 2004); *see also Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552,

1562 (5th Cir. 1991) (reasoning "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard.").  "Under the abuse of discretion standard, '[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail.'"  *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 397 - 98 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004)).  "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.*  "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence.'"  *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002) (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)).  A plan administrator or fiduciary's "decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.'"  *Lain*, 279 F.3d at 342 (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999)).

Ordinarily, when resolving factual controversies, the court's review is confined "to the evidence before the plan administrator."  *Vega*, 188 F.3d at 299 (internal citations omitted); *see also Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 (5th Cir. 1992).  It is not confined to the administrative record, however, when determining whether an administrator abused his discretion in interpreting the plan's terms and making a benefit determination.  *Wilbur*, 974 F.2d at 639.

The Fifth Circuit usually employs a two-step analysis when determining whether an administrator has abused its discretion in construing the plan's terms.  *James v. La. Laborers Health and Welfare Fund*, 29 F.3d 1029, 1032 - 33 (5th Cir. 1994).  First, the court must

determine whether the plan administrator's interpretation was the legally correct interpretation. *Id.* Second, if the plan administrator's interpretation was not the legally correct interpretation, then the court must consider whether the administrator's interpretation amounts to an abuse of discretion. *Id.* But, "if the administrator's interpretation and application of the Plan is legally correct, then [the] inquiry ends because obviously no abuse of discretion has occurred." *Baker*, 364 F.3d at 629 – 30 (citing *Spacek v. Maritime Ass'n*, 134 F.3d 283, 292 (5th Cir. 1998)).

Further, where, as here, the role of the administrator presents a conflict of interest because it evaluates claims for benefits and pays benefits, the Court must consider this conflict as a factor in determining whether there has been an abuse of discretion. *Firestone*, 489 U.S. at 115, 109 S. Ct. 948 (citations omitted) (holding "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"). Most recently, the United States Supreme Court in *Metro. Life Ins. Co. v. Glenn*, resolved any debate relative to its finding in *Firestone* by holding that the conflict of interest created by a plan administrator's dual role is "but one factor among many that a reviewing judge must take into account." *Glenn*, _____ U.S. _____, 128 S. Ct. 2343, 2351, 171 L. Ed.2d 299 (2008). That is to say, "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." *Id.* Nevertheless, such a conflict does not necessitate that a court "create special burden-of-proof rules, or other special procedural or evidentiary rules" focused on the party with the apparent conflict of interest when other rules or standards are applicable. *Id.*

V.      **ANALYSIS AND DISCUSSION**

A.      **Bush's Claim for Wrongful Denial of Benefits**

In the instant action, Unum made a factual determination that Bush no longer satisfied the definition of "disability" under the Plan, and, accordingly, concluded that her long-term disability benefits should be terminated.   Bush argues that Unum abused its discretion in terminating her benefits and in failing to consider her pain restrictions and limitations.

A determination that a participant is not disabled is "more factual in nature than interpretive in nature" and must be reviewed under an abuse of discretion standard.   *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994); *see also Lain*, 279 F.3d at 342; *Meditrust Fin. Servs. Corp.,* 168 F.3d at 213; *Pierre*, 932 F.2d at 1562 (reasoning "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard.")   Ordinarily, application of the abuse of discretion standard requires this Court to employ the two-step analysis previously set forth by this Court in its standard of review section.   *See James*, 29 F.3d at 1032 - 33.   However, "[w]hen, as here, the case does not turn on sophisticated Plan interpretation issues, the Court is not required to apply the two-step process . . . [set forth] above.   *Schaffer v. Benefit Plan of Exxon Corp.*, 151 F. Supp.2d 799, 806 (S.D. Tex. 2001) (citing *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 n. 3 (5th Cir. 1994) ("However, the reviewing court is not rigidly confined to this two-step analysis in every case."); *Rigby v. Bayer Corp.,* 933 F. Supp. 628, 631-32 (E.D. Tex. 1996) (eschewing the two-step inquiry of *Wildbur* and asking simply whether the Administrator abused its discretion)).   Rather, it must determine "whether there was substantial evidence to support the denial[] of benefits."   *Schaffer*, 151 F. Supp.2d at 806.   "Under the abuse of discretion standard, '[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail.'"   *Corry*,

499 F.3d at 397 - 98 (quoting *Ellis*, 394 F.3d at 273).   "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Id.*   "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence.'"   *Lain*, 279 F.3d at 342 (quoting *Bellaire Gen. Hosp.*, 97 F.3d at 828).

Additionally, "[i]n assessing a claim for disability, 'courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.'" *Abate v. Hartford*, 471 F. Supp.2d 724, 737 (E.D. Tex. 2006) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed.2d 1034 (2003)). "Furthermore, an administrator has no duty to conduct an independent investigation before denying a claim." *Abate*, 471 F. Supp.2d at 737 (citing *Vega*, 188 F.3d at 299) (noting that "when confronted with a denial of benefits . . . the district court may not impose a duty to reasonably investigate on the administrator"). "Nonetheless, '[a]lthough the administrator has no duty to contemplate arguments that could have been made by the claimant, [a court should] expect the administrator's decision to be based on evidence, even if disputable, that clearly supports the basis for its denial.'" *Id.*

This Court concludes, after evaluating Unum's factual determinations under an abuse of discretion standard, that its determinations are supported by substantial evidence.  In this case, Unum considered all of the records submitted by Bush, including her subjective complaints.  In considering her capabilities, it relied on medical records from her own treating physicians, including Dr. Edward McClendon, her primary care physician, Dr. S. Arif Ali, her rheumatologist, Dr. Thomas K. Cartwright, an orthopedic surgeon she reported to, Dr. Samuel Alianell, a physiatrist with whom she sought treatment, and Dr. Larry Likeover, an orthopedic

surgeon with whom she sought treatment, as well as medical assessments conducted by two of its

in-house, board-certified internists and vocational assessments completed by two of its certified

vocational rehabilitation consultants.  Bush has not supplemented the administrative record with

any objectively, verifiable medical evidence in support of her disability and lack of capacity to

perform work at any demand level.

Instead, she advances a variety of allegations in support of her wrongful denial of

benefits claim.   However, none justifies a finding in this instance that Unum abused its

discretion.   First, she argues that Unum's denial was not supported by substantial evidence

because Unum ignored a great deal of evidence relative to her "pain . . . restrictions and

limitations of physical activity" when it issued its decision.  (*See* Docket Entry No. 18, ¶18).

Second, she contends that Unum relied heavily on Dr. Ali to support its denial decision, without

ever confirming his actual opinions and/or conclusions relative to her condition.  (*Id*., ¶20).

Third, she argues that although Unum initially approved her claim, it selectively reviewed

evidence to support its subsequent decision to deny her claim.  (*Id*. at 10 – 12).  To this end, she

avers that Unum ignored new evidence provided by her in support of her long-term disability

claim, such as her supplemental claim statement filed in June of 2007, noting her inability to sit

or stand for long and short periods of time, as well as the FCE report dated November 20, 2007.

(*Id*. at 11).  Finally, she asserts that Unum's decision to deny her continued disability benefits

ignored available facts, was arbitrary, and denied her a full and fair review of her claim.

The Court finds Bush's arguments unavailing in light of the standard imposed upon its

review.   In this case, the Plan expressly provides that a participant and/or beneficiary is

considered "disabled" when she is "limited from performing all the material and substantial

duties of [her] regular occupation due to [her] sickness or injury; and [she has] a 20% or more

loss in [her] indexed monthly earnings due to the same sickness or injury."  (Docket Entry No. 16, Ex. A at UACL00113.)  The phrase "material and substantial duties" is defined within the meaning of the Plan as those duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified."  (*Id.*  at UACL00135.)

With respect to Bush's claims of "pain . . . restrictions and limitations of physical activity pain," the record undoubtedly discloses that much of the evidence supporting her claim is based on her self-described symptoms and subjective complaints.  The evidence establishes that Unum, as well as the medical experts upon which it relied, appreciated and accepted Bush's diagnosis of fibromyalgia and considered the subjective evidence she proffered.  It is also evident that Unum and its medical experts focused on the absence of objectively, verifiable medical evidence in support of Bush's disability.  Further, it is undisputed that Unum possessed medical evidence indicating that Bush was capable of performing "sedentary work."  While the FCE report dated November 20, 2007, denoted Bush's physical demand level as being "less than sedentary," it also explicitly noted that she gave less than maximum effort and/or voluntarily stopped one or more tests relative to the evaluation prior to completion.  (Docket Entry No. 16, Ex. N at UACL00560 – 574.)

Additionally, the physical therapist conducting the evaluation reported that Bush was consistent in only 11 out of 20 tests.  (*Id.* at UACL00560.)  She noted that "[Bush] demonstrated the ability to sit on a constant basis, the ability to stand and perform desk level reaching on a frequent basis, and the ability to walk, kneel, carry, push/pull, stoop and crouch on an occasional basis"—all activities that would fall within the sedentary to light capacity work level.  (*Id.*)  Moreover, Bush's own treating rheumatologist, Dr. Ali, acknowledged that he:  (1) never advised her to cease working; (2) agreed with the FCE report dated July 27, 2007, noting her

ability to perform work within the sedentary category; (3) disagreed with the findings contained

in the FCE report dated November 20, 2007; and (4) agreed that she was capable of performing

work at the sedentary demand level.  (*Id.* at UACL00440 – 53; UACL00741; *see also* Ex. K).

Further, Dr. Schnars, Unum's board-certified internist, concluded in her report, dated January 14,

2008, that "[t]here is no underlying physiologic explanation contained in [Bush's] medical

records as to preclude work at the sedentary or even light work capacity level."  (Docket Entry

No. 16, Ex. I.)  She also reasoned that "[o]ther than self report[s] of [Bush's] perceived ability

the medical records as noted are inconsistent with total impairment."  *Id.*

Indeed, the summary judgment evidence presented establishes that despite ample

opportunity, Bush did not submit objective medical evidence supporting her claim that she was

"disabled" within the meaning of the Plan and that, as a result of her fibromyalgia condition, she

exhibited a total inability to perform work at any capacity level.  During the evaluation period

relative to her appeal, she was well aware of the fact that Dr. Stephen Jacobson, one of Unum's

board-certified internists, as well as Dorothy Edwards, one of its senior vocational rehabilitation

consultants, along with Physical Therapist Eric Wilson of Select Physical Therapy, had opined

that she was capable of performing sedentary work.  Therefore, Bush had the opportunity to

refute the opinions obtained by Unum through other experts, but was unable to do so.

The fact that Unum operates under a conflict of interest in this case does not alter this

Court's conclusion, as this Court cannot say that Unum did not act within its discretion in

accepting the opinions of qualified medical experts, including Bush's own treating

rheumatologist, Dr. Ali, in denying her long-term disability claim.  *Corry*, 499 F.3d at 401

(citing *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 - 50 (5th Cir. 2007) (reasoning that

"the job of weighing valid, conflicting professional medical opinions is not the job of the courts;

that job has been given to the administrators of ERISA plans.")).   Accordingly, the Court finds

that Unum did not abuse its discretion in denying Bush's claim for long-term disability benefits.

### B.   Bush's Request for Continuance

In her response and cross-motion for summary judgment, Bush alternatively requests a

continuance to permit additional discovery "aimed at uncovering evidence demonstrating that

Unum operated under a conflict of interest in the administration of Ms. Bush's claim."  (Docket

Entry No. 18 at ¶ 8 p. 3 - 4).  She contends that additional time is needed so that the parties can

address the extent to which Unum's conflict of interest affects the level of review relative to her

claim.  (*Id.* at 4.)  The Court will construe Bush's alternative request as a request for continuance

in accordance with Rule 56(f) of the Federal Rules of Civil Procedure.  Rule 56(f) states that "[i]f

a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts

essential to justify its opposition, the court may . . . order a continuance to enable . . . depositions

to be taken, or other discovery to be undertaken . . . ."  FED. R. CIV. P. 56(f)(2).  "To obtain to

[*sic*] the shelter of rule 56(f), the party resisting summary judgment must present specific facts

explaining the inability to make a substantive response as required by rule 56(e) and must

specifically demonstrate how discovery will enable him to establish the existence of a genuine

issue of material fact."  *Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 907 (5th Cir. 1992) (citing

*Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 167 (5th Cir. 1991); *Sec. & Exch. Comm'n*

*v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980), *cert. denied*, 449 U.S. 1082,

101 S. Ct. 866, 66 L. Ed.2d 806 (1981)).

In addition to her failure to satisfy the formal prerequisites of Rule 56(f), Bush has failed

to demonstrate diligence in her attempts to obtain the discovery she now seeks.  Moreover, she

has failed to offer an explanation as to how the discovery she seeks will provide her refuge from

the legal deficiencies that Unum has raised in its motion for summary judgment or create a genuine issue of material fact sufficient to withstand Unum's summary judgment evidence. Indeed, it is undisputed in this case that Unum's dual role as the evaluator of claims and payor of benefits presents a conflict of interest.   Nevertheless, in light of the U.S. Supreme Court's decision in *Glenn*, no uncertainty exists as to the amount of deference to be given to Unum's decision under the applicable standard of review.   Thus, because an adequate time for discovery has passed and Bush had failed to demonstrate how the additional discovery she now seeks will enable her to establish the existence of a genuine issue of material fact for trial, her request for continuance is DENIED.   *See Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) (noting that "[a] plaintiff's entitlement to discovery prior to a ruling on a summary judgment motion may be cut off when, within the trial court's discretion, the record indicates that further discovery will not likely produce facts necessary to defeat the motion"); *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 - 86 (5th Cir. 1990) (reasoning that the trial judge did not abuse his discretion in denying a non-movant's request for continuance of a ruling on a motion for summary judgment because he failed to demonstrate how the additional time requested would enable him to rebut the movant's allegations that no genuine issue of fact existed for trial).

## VI.    CONCLUSION

After reviewing the information contained in the administrative record and the summary judgment evidence, the Court finds that Unum's decision is supported by substantial evidence in the record and that a rational connection exists between its conclusion that Bush was not "disabled" within the meaning of the Plan and the information on which it relied to support its conclusion.   Moreover, the Court concludes that Unum provided Bush with a "full and fair

review" of its denial of her claim for disability benefits.   Therefore, Bush has failed to demonstrate a genuine issue of material fact as to whether Unum abused its discretion in denying her claim for benefits and Unum's motion for summary judgment is GRANTED.  Bush's cross-motion for summary judgment is DENIED.

It is so **ORDERED.**

SIGNED at Houston, Texas this 3rd day of August, 2010.

Kenneth M. Hoyt
United States District Judge